**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

GREGORY HOUSTON HOLT, ADC #129616,                              PLAINTIFFS
RODNEY MARTIN, ADC #132396, and
WAYDE STEWART, ADC #065252

v.                                         5:19CV00081-BSM-JTK

WENDY KELLEY, et al.                                          DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Brian S. Miller. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.    Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.    The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I.    Introduction

Three Arkansas state inmates – Gregory Holt, Rodney Martin, and Wayde Stewart – filed this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S,.C.§ 2000cc, et seq. Holt is incarcerated at the Tucker Maximum Security Unit and Martin and Stewart are incarcerated at the East Arkansas Regional Unit of the Arkansas Division of Correction (formerly known as Arkansas Department of Correction) (ADC). They challenge two ADC policies as violative of their First and Fourteenth Amendment rights, and RLUIPA. Plaintiffs ask

for monetary, declaratory, and injunctive relief. Defendants are ADC officials, Wardens, and Chaplains.

This matter is before the Court on the parties' cross Motions for Summary Judgment, Briefs in Support, and Statements of Facts (Doc. Nos. 41-45). The parties filed both Responses and Replies to the Motions. (Doc. Nos. 54-57, 62, 65) In addition, the United States of America filed a Statement of Interest to address the application of RLUIPA to the ADC, and the ADC responded. (Doc. Nos. 64, 66)

## II.    Complaint (Doc. No. 1-2)

Plaintiffs are Muslims who are commanded to observe Fridays through a congregational prayer known as Jumu'ah Prayer. They claim that the Friday service offered by the ADC, pursuant to its religious policies, violates their sincerely-held beliefs because they must pray and worship with other religious faith groups, such as the Nation of Islam (NOI) and Five-Percent Nation/Nation of Gods and Earths (NGE), which do not adhere to the same beliefs/practices as Plaintiffs.

According to the Complaint, Islam, NOI, and NGE are three different faith traditions. Islam was founded by the Prophet Muhammad, the final prophet, in 610 A.D. The Qur'an is the Islamic holy scripture, and Plaintiffs and other Muslims adhere to the teachings of Prophet Muhammad and the Qur'an. NOI was founded in 1930 by Wallace Fard Muhammad and teaches that the black man is God. NGE was founded in 1964 by Clarence Smith following a theological dispute with an NOI successor, and also teaches that the black man is God.

In a 1987 consent decree in <u>Blue v. Arkansas Board of Correction</u>, the Arkansas Department of Correction (ADC) agreed to hire a part-time Muslim chaplain to provide group Islamic services for Muslim inmates, to recruit and organize free world volunteers of NOI and AMM[1] to provide additional services, and to voice Islamic concerns with the ADC chaplaincy program. No. 84-cv-551 (E.D.Ark. August 31, 1987). Other litigation resulted in an injunction requiring ADC to offer access to a pre-recorded Khutbah (sermon) when a live Khutbah was not available, and to allow Muslim inmates to read aloud from the Qur'an during Jumu'ah. <u>Shabazz v. Arkansas Dept. of Correction</u>, 5:03cv00409 (E.D.Ark. 2005), <u>different issues aff'd</u>, 268 Fed.Appx. 487 (8th Cir. 2008), and <u>Shabazz v. Norris</u>, 5:03cv00401, 2007 WL 2819517 (E.D.AR 2007).

Pursuant to this litigation, the ADC established religious policies and procedures intended to "provide those incarcerated in its care the greatest amount of freedom and opportunity for pursuing individual religious beliefs and practices as is consistent with safety of inmates and staff, the good order of the institution and accepted correctional practices." ADC Religion Manual, "Policy of Religious Services," No. 120. ADC hired an Islamic Coordinator to ensure that inmates are afforded worship and growth opportunity, and to travel on a regular schedule to the various units to counsel with inmates, lead Jumu'ah Prayer, Taleem (religious study) classes, and others. Policy No. 204 at B; Policy No. 505 at B. The Coordinator is required to select an inmate at each unit who is knowledgeable of the Islamic prayer (Jumu'ah) ritual, who upon approval by the Warden,

---

[1] The Court is unclear as to the meaning/designation "AMM."

will lead the Jumu'ah Prayer at each Unit. Policy No. 545 at I.A. If the Islamic Coordinator or a free-world Muslim Volunteer is not available at the prayer service, the prayer is followed by a recorded Khutbah (sermon). Policy No. 545 at II; Policy No. 310 at D; Policy No. 515 at B; Policy No. 605 at C.

Plaintiffs claim that Defendants violate their own policies and willfully fail to provide for the religious needs of Muslim inmates by failing to respect the religious differences between Islam, NOI and NGI, and forcing them to choose between attending a combined religious service or not attending any services at all. They claim that no other faith traditions at the ADC are required to hold combined religious services, and that their religious beliefs are violated if they attend a religious service led by a different faith tradition. They also claim Defendants fail to recruit adequate free world Muslim volunteers to meet the needs of the Muslim inmate population. Because Plaintiffs have resided in several of the ADC Units and claim the combined religious services and study classes take place at all Units, they included as Defendants the Wardens and Chaplains of those Units.

Plaintiffs also challenge the ADC policy on wearing religious attire, specifically their Kufi (hat). The policy provides that an inmate may wear a special religious headdress during religious services only and store the headdress in the inmate's locker when not in use. Policy 625(C)(1). Plaintiffs claim that other faith groups are allowed to wear religious and non-religious head coverings outside of their individual cells and religious services.

Plaintiffs claim that these combined religious policies violate RLUIPA because they

impose a substantial burden on their religious exercise without furthering a compelling governmental interest. They also claim the policies/practices violate the Free Exercise Clause of the First Amendment because the policies burden their religious exercise in a manner that is neither equal nor neutral compared to the treatment of Christians and other comparable inmate groups.

## III.    Evidence/Exhibits

### A.    Religious Policies (Doc. No. 45)

The relevant policies/sections, issued by Joshua Mayfield, Administrator of Religious Services, include the following:

> **1) Policy No. 130, "Objectives of Religious Services." (p. 7)**
>
> The objectives of the Religious Services are: …b. To allow worship opportunities for committed offenders with an openness to, a recognition of, and respect for, religious differences. **All religious worship opportunities are to be led by approved free world volunteers** with the goal of meeting the spiritual needs of the inmates. (emphasis added)
>
> **2) Policy No. 205, "Positions." (p. 8)**
>
> B. Islamic Coordinator. The Islamic Coordinator is responsible for ensuring that Islamic inmates are afforded worship and growth opportunities within the Department of Correction within the bounds of the safety and security of the institutions. This is accomplished through the oversight and evaluation of Islamic programs and services, the recruitment and training of Islamic volunteers, and traveling on a regular schedule to the various units to counsel with inmates, lead Jumu'ah Prayer, Taleem classes, etc. The Islamic Coordinator works under the leadership of the Administrator of Religious Services.
>
> **3) Policy No. 310, "Criteria in Determining Freeworld Groups Permitted into Unit/Center." (pp. 9-10)**
> ……

6

C. The free world groups will conduct themselves so as to appeal to the broad spectrum of religious life without discussing the distinctives of denominational and non-denominational doctrines or practices.

D. **No religious service will be held unless an approved freeworld sponsor is present and in charge**….However, the Chaplain present may conduct the service in their stead if the service is not classified as a sectarian/denominational service. (emphasis added)

Exception:    **Jumu'ah Prayer Quran 2:255** (emphasis added)
The Unit Chaplain supervises Jumu'ah Prayer (non-sectarian services) at the Unit when the Islamic Coordinator or approved free world Muslim Volunteer is not present in the service. The ritual of Jumu'ah Prayer will be observed followed by a recorded Kutbah. (See policy #545).
……

**4) Policy 505, "Worship." (pp. 11-12)**

Worship opportunities will be provided on a non-sectarian basis subject to space and security considerations….

**5) Policy 510, "Denominational/Sectarian Studies/Worship." (p. 13)**

A. Denominational/sectarian worship/study classes may be provided at the discretion of the unit Warden/Center Supervisor, the Unit/Senior Chaplain and the Administrator of Religious Services.

B. Periodic denominational/sectarian events may be scheduled to enrich the worship life of the inmates in accordance with Department and Unit Policy.

C. The denominational/sectarian services are intended to meet the needs of a particular faith group, usually attended only by members of that group. A minimum of three (3) inmates (with a valid religious preference on file) are required to schedule specific denominational/sectarian services.

D. All Denominational/sectarian services **must be under the direction of a documented authority of that specific denomination/sect**. (emphasis added)

**6) Policy 545, "Jumu'ah." (pp. 14-15)**

7

Jumu''ah Prayer is held Fridays by the Islamic Coordinator or approved free world volunteer. (See exception under policy 310 and 605).

Procedures:

I.    That the Islamic Coordinator select inmate(s) at each unit that is knowledgeable of the required prayer ritual and submit the name of the inmate, in writing, to the Unit Warden for approval.

> A. This inmate would be responsible for leading the Jumu'ah Prayer….This inmate will read the Quranic selection provided by the Islamic Coordinator. The inmate will not bring a Khutbah. A Khutbah recorded by the Islamic Coordinator or a Free World ADC volunteer with be shown following the prayer….
>
> B. This task must not be permitted to constitute authority over other inmates.
>
> C. The Unit Warden may remove this inmate for reason.
>
> D. The Islamic Coordinator will establish standard operating procedures for the inmate prayer leader and submit the standard operating procedures to the Administrator of Religious Services for approval. It must be made clear to this inmate what the functions and responsibilities will be.
>
> E. Violation of these standard operating procedures by the inmate may result in cancellation of the services and suspension of the arrangement.
>
> F. The Unit/Senior Chaplain will report violation of standard operating procedures to the Islamic Coordinator with copy to the Administrator of Religious Services.
>
> G. The Islamic Coordinator will meet with the violators to clear up misunderstanding and to ensure policy and procedures will be followed.

II.    When the Islamic Coordinator or approved free world Muslim Volunteer is in charge, a Khutbah (sermon) or discussion may be held. In the

8

absence of the Islamic Coordinator or approved free world Muslim volunteer, a recorded Khutbah (made by the Islamic Coordinator or approved free word (sic) Muslim volunteer) will be shown following Jumu'ah Prayer. A security officer is to be present during the service.

III.    The Unit Chaplain will continue to recruit freeworld Muslim volunteers to be in charge of Muslim Services at the Units.

IV.    Prior to Jumu''ah Prayer the inmate should have already had a bath/shower the Friday prior to Jumu''ah (between midnight and noon, work schedule notwithstanding). (Hadith, book 13, Chapter 2:Sec. 4)

V.    To maintain continuity between units and annual time changes, Jumu''ah prayer will be held at 1:00 p.m., each Friday.

**7) Policy No. 625, "Religious Articles/Literature." (pp. 18-19) …..**

C. Special Religious Headdress

1.    Inmate may wear special religious headdress during religious service. The headdress must not threaten the good order and security of departmental operations. The headdress must be recognized by the inmate's denominational/mosque/synagogue/tribe as being essential to a particular sect's religious belief. The headdress is to be worn in religious service only and kept in inmate's locker when not in use…..

**B.    Prior Litigation**

Pursuant to a settlement Order in Blue v. Arkansas Board of Correction, PB-C-84-551 (E.D.Ark. Aug. 31, 1987), the ADC agreed to "hire a part-time Muslim Chaplain to provide group Islamic services for Muslim inmates, to recruit and organize freeworld volunteers of NOI and AMM Muslim denominations to provide additional services, and to voice Islamic concerns with the chaplaincy program of the ADOC." (Doc. No. 45-13, p. 2)

The Order further directed that Jumu'ah prayer be scheduled each Friday for approximately one hour, with an additional weekly service of one and one-half hours. (Id., p. 3) "The weekly congregational service will be scheduled separately for NOI and AMM Muslims. Jumah prayer is envisioned as 'non-denominational' but the ADOC will leave the decision as to the need for separate NOI and AMM Jumah prayer to the discretion of the part-time Muslim Chaplain." (Id.) The Order recognized that the Chaplain could not personally conduct all the Muslim services at all the Units and directed the Chaplain to utilize his role to organize and recruit freeworld volunteers to fill the scheduled services. (Id.)

In June 2006, United States District Judge James M. Moody issued a permanent injunction which required the ADC to provide all units with video-recorded Khutbahs delivered by a qualified person of its choice and to allow Muslim inmates to view such each Friday in the absence of a qualified person to deliver a live Khutbah. Shabazz v. Arkansas Department of Correction, 5:03CV00409-JMM/JTR (E.D. Ark. June 27, 2006). (Doc. No. 41-12)

A permanent injunction was entered to require the ADC to permit an inmate selected by the Islamic Coordinator to lead Jumu'ah Prayer each Friday and to read from the Qur'an, in Shabazz v. Norris, 5:03CV00401-WRW/BD (E.D. Ark. September 26, 2007). (Doc. No. 41-13)

### C.    Deposition Testimony/Affidavits

#### 1)    Plaintiffs

##### a)    Gregory Holt

Holt currently is incarcerated at the Maximum Security Unit in the administrative segregation area of general population. (Doc. No. 41-9, p. 7) He prefers one-man cell housing because he does not like the open barracks setting and is able to keep with him much of his legal work. (Id., pp. 8-9) He is allowed to wear his Kufi in his cell (where he stays twenty-two hours per day), and he also was allowed to wear it when he was incarcerated in barracks housing. (Doc. No. 45-15, p. 5) In theory, all headgear is prohibited in other non-housing areas, but he has seen inmates wearing "outside" hats in the hallways. (Id., p. 8) He is a Muslim who follows the Sunnah, which are the things said and done by the prophet, but he is not a Sunni or a Shia Muslim. (Id., pp. 10, 23) He believes that the teachings of the NOI are incompatible with the Sunnah because NOI teaches that black man is God in contradiction of the Qur'an, and promotes racial disharmony and stirs up racial strife. (Id., pp. 8-9)

Holt's belief, as revealed by the Qur'an, requires an obligatory congregational prayer (Jumu'ah) to occur in the early afternoon hours every Friday. (Doc. No. 45-12, p. 2) Islam requires that Jumu'ah be led by a Muslim, be performed with others, and include a religious sermon (Khutbah). (Id., pp. 2-3) Any deviations from Jumu'ah requirement invalidate the prayer. (Id., p. 3) Holt previously was incarcerated at the Cummins Unit where he attended Jumu'ah services until the person who was selected as the prayer leader espoused NOI views that did not coincide with the Qur'an. (Doc. No. 45-15, p. 10) Holt became angry and left the service when that person talked about political issues. (Doc. No. 41-9, p. 15) NOI adherents contradict the central belief that there is only one God, and

should not be permitted to lead Jumu'ah prayer. (Doc. No. 45-12, p. 3) NGE adherents preach that black man is God and Five Percenters told him they do not consider themselves to be Muslims, so they also cannot lead Jumu'ah prayer. (Id.) However, Holt also stated that when a prayer leader, even if a member of NOI, leads in accordance with Islam and sticks to the Qur'an, the prayer is properly led. (Doc. No. 45-15, p. 18) He believes that if the different Muslim groups are allowed to worship together, the service violates his faith, because he is forbidden to pray behind someone who does not believe in Islam. (Doc. No. 45-12, p. 19) He does not attend Jumu'ah services at Tucker and receives second-hand information about what occurs at the services. (Id., p. 25) Even if the policy changed and the prayer leader was an adherent of Islam, the service would not satisfy Plaintiff's concerns because the different sects would still worship together. (Doc. No. 41-9, p. 35) Plaintiff once was incarcerated at the federal penitentiary in Pollock, Louisiana, where they held three separate Jumu'ah services for NOI, Moorish Science Temple, and Al-Islam, and he believes that FCI Forrest City also allows three services. (Id., p. 28; Doc. No. 45-12, p. 4) He also watched an episode of the show "Lockdown," where a maximum facility in Georgia offered Muslims a separate Jumu'ah service for NOI and Muslim adherents. (Id.)

Holt's goal in this lawsuit is to have an Islamic Jumu'ah service attended and led by Sufi, Salafi, Shia or Sunni Muslims, since these denominations have the same core beliefs in the prophet of Islam, the oneness of Allah and the five pillars of Islam. (Doc. No. 57-2, pp. 1-2) However, NOI and NGE adherents are not a sect of Islam. (Id., p. 2) After his deposition, he studied interdenominational prayer and now no longer believes that Shia or

Sufi Muslims should sit in the back at Jumu'ah prayer. (Id.) He cannot pray with or behind people who belong to other religions, and considers NOI and NGE adherents to belong to a separate religion. (Id.)

### b) Rodney Martin

Martin is incarcerated at the East Arkansas Regional Unit (EARU) and is a Muslim who believes that Jumu'ah prayer should be conducted in a certain way and led by a Muslim. (Doc. No. 45-19, p. 19; Doc. No. 45-14, p. 2) He believes his prayer is invalidated if the prayer service is led by NOI or NGE adherents because they rely on texts outside of the Islamic tradition, and focus on issues which contradict Islam. (Doc. No. 45-14, p. 3) He once served as an assistant prayer leader at Tucker, Tucker Max, Calico Rock and the Randall Williams Units, and if he was not incarcerated he would attend a Mosque with Sunni Muslims.(Doc. No. 45-19, pp. 4, 8) Normally, chaplains will not allow prayer leaders to deviate from the Qur'an text in Khutbahs, and if the service is conducted correctly, it falls in line with his beliefs. (Id., pp. 11, 13) However, the fact that NOI and NGE inmates are present in the room violates his religious rights, and they all have a right to their own services. (Id., pp. 15, 16) Martin does not attend Jumu'ah at EARU because the service leader is a member of NOI and this would invalidate his prayer. (Id., p. 19; Doc. No. 45-14, p. 4) He has not attended a Jumu'ah service at EARU, and while he can pray in his "rack", he is prescribed to attend Jumu'ah prayer. (Doc. No. 45-19, pp. 19, 21) Medical personnel at ADC can give an inmate permission to wear a hat at all times and in all places and he has seen inmates wear headgear at all times and in all places. (Doc. No. 45-14, p.

4) In addition, officials at the "Demont" facility allowed Rastafarian inmates to wear Kufis whenever and wherever they please. (Id.)

### c)    Wayde Stewart

Stewart also is currently housed at the EARU and previously was housed at Tucker Max and the Grimes Unit. (Doc. No. 45-24, p. 3) He is a Muslim and believes that NOI, NGE, and Five Percenters are totally different religions and not sects of Islam. (Id., p. 7) Jumu'ah is desecrated when led by an inmate of those other groups because they pray to a different God. (Id., p. 9; Doc. No. 45-10, p. 3) ADC's refusal to provide separate services creates religious tension between the different groups and praying with and behind NOI and NGE adherents means that the only Jumu'ah prayer service available to him is not compatible with his faith. (Doc. No. 45-10, p. 3) The current ADC policy satisfies his ability to practice his religion, but inmates are not following the policy. (Doc. No. 45-24, p. 15) As long as the prayer/sermon leader is a Muslim, it is okay with him but not with Allah. (Id., p. 19) He prays at all times and should be allowed to wear his prayer cap at all times. (Id., p. 10) ADC's current practices and policies do not ensure a service that complies with his faith because people who are not Muslim regularly lead the prayer. (Doc. No. 57-1) While it is consistent with Islam for a Muslim of any sect to lead Jumu'ah, NOI and NGE are not sects of Islam because they believe in a different god with human dimension and have Twentieth Century prophets. (Id., p. 2)

### 2)    Defendants

### a)    Joshua Mayfield

Mayfield was first hired as a unit chaplain at Tucker in 2010 and has served as the ADC Administrator of Chaplaincy Services since 2014. (Doc. No. 42-1, p. 4) His supervisor is Deputy Director Rory Griffin. (Id.) The ADC employs eighteen chaplains, one Islamic Coordinator, and one administrative assistant to cover the religious needs at thirteen correctional facilities. (Id., p. 8) The ADC recognizes five major world religions: Hinduism, Buddhism, Jewish, Christian, and Islamic, in addition to many inmate beliefs which do not fall under any of those categories. (Doc. No. 45-1, p. 3) The ADC understands Islam to be the religion and Muslim to be the practitioner, and the two designations are understood to be tied to the same faith group. (Id., p. 8) Some people consider NOI to be a religion and some a denomination, and the ADC understanding is that it is a denomination because of the recognition of Allah and use of the Qur'an as the primary religious text. (Id., p. 13) The ADC considers NGE to be a denomination of Islam, and does not currently offer religious programs or services specific to NGE or NOI, other than special occasions or holidays such as Saviour's Day. (Id., p. 14) The NGE also is being monitored by some FBI groups as a security threat group. (Id., p. 13) Mayfield stated that there have been requests for NOI to be recognized as a separate religion. However, after talking with the Islamic coordinator and inmates, they concluded NOI should participate in nondenominational services offered to all Muslims, but could schedule a denominational/sectarian service in accordance with policy 310 when a free world sponsor is available. (Id., p. 15) He added that Friday prayer services, Taleem, Ramadan, and Eid feasts are nondenominational. (Id., p. 15)

The ADC understanding of the Friday prayer service is that it is required by inmates who affiliate as Muslim or under the Islam religion; however, if an inmate is listed as a Muslim and does not participate in Friday prayer, the ADC cannot deny his request to participate in an Islamic religious holiday such as Ramadan. (Id., p. 16) Currently, the Islamic Coordinator is Muhammad Ameen, who is a Muslim. (Id., p. 17) As it stands, the Jumu'ah prayer policy does not require a free world sponsor unless someone wants a separate sectarian service. (Id., p. 19) The ADC could deny a request for a separate denominational (sectarian) service based on a security threat, the lack of a free world credentialed sponsor, fewer than three inmates involved, or due to an excessive burden on the institution. (Id., p. 21) If Muslims want a separate sectarian service, the ADC could approve if those four criteria were met. (Id., p. 25) Policy 310, which requires a free world sponsor, contains an exception for Jumu'ah prayer if the prayer remains nonsectarian; however, if it became sectarian, policy 510 would apply to require a volunteer. (Id., p. 22) Policy 545 was drafted to comply with a court order, and although nothing in that policy prohibits ADC from providing a denominational Islamic service, the free world sponsor requirement still applies. (Id., p. 24)

Staff demands and time constraints generated by the increased movement of inmates are primary reasons for not holding separate Jumu'ah services at the same time in alternate spaces, although some ADC units are equipped with spaces to accommodate separate Jumu'ah services. (Id., pp. 26-7) Pursuant to the consent decree in the Blue case, the ADC hired a Muslim chaplain who is now full-time and serves Muslim inmates, recruits and

16

organizes free world volunteers, and voices Islamic concerns within the chaplaincy program. (Id., p. 31) The ADC has recruited volunteers to provide sectarian NOI services for two different holidays. (Id.)

Currently at the Cummins Unit, five different religious groups meet on Saturdays between 7:30-9:00 a.m., and two more groups meet simultaneously from 9:00-10:30 a.m. (Id., p. 33) There is not a written policy to prevent Tucker Max from scheduling back-to-back programs in the same space, but the 1:00 time slot for Jumu'ah services on Fridays meets the need of Muslim adherents and is least restrictive for the Unit. (Id., p. 35) General population Christian services are open to inmates of any and all faiths, and denominational services take place during the evening after normal working hours or on weekends, when it is easier to fit into the unit-wide schedule. (Doc. No. 41-2, pp. 20, 39)

Head coverings outside of religious services are not allowed because of security concerns related to contraband movement or identification with security threat groups (STG). (Doc. No. 45-1, pp. 37-8) In addition, if such were allowed other inmates might disrespect certain headdresses. (Id.) Mayfield is aware of two to five instances in the last ten years where Kufis were used to hide contraband. (Doc. No. 41-2, p. 54) In addition, a religious administrator in another state once told him about an inmate who was found with a SIM card in his Kufi. (Id., p. 54)

### b)    Muhammad Ameen

Ameen is a Muslim and has served as the Islamic Coordinator for the ADC since 2006. (Doc. No. 41-10, p. 1) He also serves as the Assistant Imam (Pastor) at Al-

Mu'minun, a Masjid (mosque) in Memphis, Tennessee, where he previously served as Head Imam. (Id., p. 2) He is familiar with various sects of Islam such as Sunni Muslims, Shi'a Muslims, and Nation of Islam (NOI), and understands that each hold the Qur'an as the principal religious text and study and adhere to the words and actions of the Prophet Muhammad. (Id.) Each sect participates in a single Friday congregational prayer known as Jumu'ah Prayer, which follows a pattern that includes passages from the Qur'an, prayers and the Khutbah (sermon). (Id., pp. 2-3) The Khutbah is composed of two parts, a discussion of God and a discussion of community concerns. (Id., p. 3) The Jumu'ah Prayer should be non-sectarian in nature because it is based solely on the Word of God in the Qur'an. (Id.) The various sects or schools of thought conduct weekly Taleem classes to study the Qur'an, which also should be non-sectarian in nature. (Id.) While some interpretative differences exist between those schools of thought, the Jumu'ah Prayer and Taleem classes are similar. (Id.) Kufis, or short brimless hats, are worn by some but not all Muslims, and a believer is not considered less a Muslim if he does not wear a Kufi. (Id.)

Ameen's typical day includes travelling to one of the fifteen Units of the ADC and visiting with Muslim inmates in that Unit. (Id., p. 4) When he visits on Fridays he leads Jumu'ah Prayer and conducts a Taleem class afterward, but if the visit is on another day, he only leads a Taleem class. (Id.) The ADC religious services policies require that all worship opportunities be provided on a non-sectarian basis subject to space and security considerations, and the Jumu'ah Prayer and Taleem classes conform with that requirement. (Id., p. 5) Jumu'ah Prayer is held at each Unit at approximately 1:00 p.m. every Friday,

and follows a scheduled pattern. (<u>Id</u>.) When Ameen is not at a particular Unit on Friday, and when a free world volunteer is unavailable, ADC policy 545 permits an approved inmate to lead the Jumu'ah prayer. (<u>Id</u>., p. 6) That inmate is selected by Ameen and submitted for approval to the Unit Warden to be designated as the prayer leader. (<u>Id</u>.) Ameen will not select an inmate to be prayer leader if he believes Jumu'ah Prayer will be conducted in a sectarian or denominational fashion. (<u>Id</u>., p.7) The inmate does not guide or teach or give a message, but leads the prayer and reads from the Qur'an, followed by the showing of a previously-recorded Khutbah. (<u>Id</u>.)

Ameen has had difficulty finding Muslim free world volunteers who can meet the ADC background checks and other requirements, and understands that ADC intends to request funding to create another position for a Muslim chaplain in its next budget cycle. (<u>Id</u>., pp. 6, 8) Over the past several years, Ameen became aware on a few occasions of an inmate prayer leader who deviated from policy and made comments inappropriate for a nondenominational Jumu'ah Prayer service. (<u>Id</u>., p. 8) In those cases, he removed the inmate as prayer leader and selected another for the role, and he relies on the inmates to inform the Chaplains about similar instances. (<u>Id</u>.) The ADC policy which requires the presence of an approved free world sponsor in charge of each religious service applies to all religious services except for Friday Jumu'ah Prayer. (<u>Id</u>., p. 9) Although ADC policy 510 allows for denominational/sectarian services, it requires a minimum of three inmates to schedule the service and requires the services to be under the direction of a documented authority of that denomination/sect. (<u>Id</u>., p. 10) An example of a sectarian Muslim service

is the Saviour's Day service for NOI inmates when attended by approved free world volunteers. (Id.) ADC policy also provides for the observance of Islamic holy days, including Ramadan, Eid-ul-Fitr, and Eid-ul-Adha. (Id.) Policy 550 provides for the observance of Ramadan and inmates will not lose their designation as Muslim if they do not attend Friday Jumu'ah prayer or do not participate in Muslim religious services. (Id., p. 11) The only way an inmate loses a designation as Muslim is if he voluntarily chooses to change his religious affiliation in accordance with ADC policy. (Id.)

ADC policy 625 relates to the use of religious headdress and permits the wearing of such during religious services only, and must be recognized by the inmate's denomination as being essential to that particular sect's religious belief. (Id.)

### c)    Jim Babcock

Babcock has served as Chaplain at the Cummins Unit since 2010, where he schedules services for all denominations and solicits volunteers. (Doc. No. 41-6, pp. 4-5) Four Muslim volunteers visit Cummins on a semi-regular basis to assist with Islamic services, and there is potential to add some others who currently volunteer at the Ouachita River Unit. (Doc. No. 45-6, p. 4) About sixty to eighty inmates attend Jumu'ah each week at Cummins, and they meet on Fridays in the library, which can hold about 150 inmates. (Id., p. 13) As Chaplain, he attends Jumu'ah, and a free world volunteer attends once every two months. (Id., p. 14) The Chaplain chooses the inmate prayer leader and inmates may vote to approve the leader, who is then reviewed by the Muslim coordinator and Warden. (Id., p. 15) This system works well without any arguments. (Id.) The inmate leader is

supposed to read from the Qur'an but sometimes will want to add commentary, and radical behavior may disqualify an inmate from being a prayer leader. (Id., p. 16) An inmate prayer leader is allowed to choose someone else to read out of the Qur'an, but that person must be pre-cleared by the Chaplaincy office. (Doc. No. 41-6, p. 21) Babcock remembers denying a leader's request for a reader because the person selected was too radical and wanted to add commentary. (Id., p. 22) He understands that NOI followers believe Allah is a man and Muslims (Shias and Sunnis) believe he is a spirit. (Id.) While NOI is composed of black followers, Islam can be any race. (Id., p. 19) All the Muslims worship together mainly because of the time constraint of the service and the security difficulties posed by the required time of the services, which is between 1:00-2:00 according to Islam. (Id., p. 20) Chaplain Ameen teaches broadly in the Khutbahs to reach all Muslims and the NOI members. (Doc. No. 41-6, p. 33) While the Cummins visitation room could hold an additional thirty to forty men at the same time as the other service in the library, it would still pose a staffing issue because they would need an additional chaplain and other security officers. (Doc. No. 45-6, p. 21)

At times, Babcock is aware of tension between Muslims and NOI, mainly because they don't like each other and squabble about their differences. (Id.) However, he does not consider them separate religions because they use the same Bible and believe in the same God. (Id., p. 24) Other services offered at Cummins include a Hispanic Christian service and Protestant service in the visitation area, two denominations in the chapel area on Saturdays, and Catholic services conducted on Wednesday, with one mass offered per

month. (Id., pp. 24-25) The only time that two services are held at the same time is on Saturdays. (Id., p. 27) Babcock agrees with the current policy for one nonsectarian Jumu'ah prayer service because separate services could put a strain on security and the chaplaincy department and could also have a domino effect with other inmates wanting more and more separate services. (Id., p. 30)

Babcock's concern with NOI is that a majority of them are connected with the Gangster Disciples group, and if they have their own service, it will provide an opportunity for them to band together; however, if they are mixed with others, "you're watering it down so they're not able to band together." (Id., p. 32) At the same time, he must closely watch other gangs such as the Aryan brothers who also can band together at church. This issue prompted him to decrease the numbers permitted at other denominational services and split the services. (Id., pp. 34-35)

Babcock foresees several problems with allowing inmates to wear Kufis at all times and in the common areas, such as potential trafficking and trading, abuse of the privilege by men who are not Muslims wearing them to offend others, and use of them with symbols or colors to designate particular gangs. (Id.) He never witnessed a security incident related to a Kufi worn at a service and does not see a problem with an inmate wearing the cap in his cell/barracks. (Id., p. 38) Muslims also are permitted to use prayer rugs which can be obtained from local mosques by request. (Doc. No. 41-6, p. 8) About ninety out of approximately 250 Muslim inmates participated in Ramadan this year, which was lower than normal. (Id., p. 19)

### d)   Tommy Bourgeois

Bourgeois has served as the Tucker Unit Chaplain since the latter part of 2017. (Doc. No. 45-7, p. 7) In February 2019, Chaplain Mayfield invited the Madina Institute to speak with all the chaplains about the Institute's goal to work with the ADC to minister to Islamic inmates. (Id., p. 4) Once these volunteers are trained and approved, they help to lead Jumu'ah prayer and deliver the Khutbah. (Id.) Since October 2019, the Institute's volunteers have served at two to three services, with no inmate complaints. (Id.) In the absence of a volunteer or Chaplain Ameen, the Friday Jumu'ah service is led by an inmate leader selected by the Islamic community and approved by the Chaplain, who reads from the Qur'an and conducts prayer. (Id., p. 6) Bourgeois has observed some tensions between NOI and Muslim inmates at Tucker Max, when NOI inmates sometimes stray from the service agenda and talk politics and racism. (Id., p. 5) Bourgeois once was involved in a situation where a NOI inmate prayer leader was removed after he strayed from the norms. (Id., p. 7) At Tucker Max, about forty inmates identify as Muslim, ninety identify as Islamic, and less than ten identify as NOI. (Id., pp. 7, 9)

Jumu'ah service is held at the chapel at Tucker Max every Friday. (Id., p. 9) In the past, volunteers led special NOI services for Saviour's Day and the Day of Atonement, and Bourgeois noted that some non-NOI Muslims attended those services. (Id., pp. 10-11) The Unit also provides denominational services for Muslims such as Ramadan, Eid Al-Fitr and Eid Al-Adha. (Id., p. 12) He believes the differences between Muslims, NOI and the Five Percent Nation are more social and philosophical than the overall worship, and he is not

aware that they have different faiths. (Id.) He has attended Jumu'ah and has attended when specific NOI teachings were discussed, but he does not believe racist rhetoric is appropriate in Jumu'ah or any other services. (Id., p. 13) At one point an inmate wanted to present a Farrakhan video, which eventually was played in one of the NOI denominational services. (Id.) If the Chaplain notices that a prayer leader varies from the spiritual to the social realm, the Chaplain will sit in the service, which usually resolves the problem. (Id., p. 16) One of his concerns with holding separate Islamic services is the lack of volunteers and staff security, and also an increase in more racist rhetoric if NOI inmates congregate together more frequently. (Doc. No. 41-5, p. 24) While inmates occasionally have been approved to deliver the Khutbah, he wants to phase that out to prevent them from using it as an agenda. (Doc. No. 45-7, p. 16)

The problems with allowing Kufis in the common areas include inmates who sign up to wear them for a fashion statement (which might insult true believers and cause strife), gang members who use them to designate their group, or use of them to hide contraband. (Id., p. 18) He has received complaints from Christians because only two to three barracks at a time are permitted to attend their services, while the Muslim attendance at Jumu'ah services is unlimited. (Id., p. 20)

e)    **Danny Burl**

Burl served as Warden of the Maximum Security Unit from 2015 until he retired in 2017. (Doc. No. 41-4, p. 4) He was not involved in implementing the religious policies. (Id., p. 6) Inmates were allowed to wear winter and summer caps for outside work but were

not allowed to wear them inside. (Doc. No. 45-8, p. 5) The concern was with security, with faces covered during assaults, and with gang designations. (Id.) He did not know of incidents where hats/caps were used to hide contraband. (Id.) Jewish inmates were allowed to wear Yarmulkes during religious meetings or church services and Muslims could wear Kufis in their services and in their cells. (Id.)

### f)    Aundrea Culclager

Culclager is Superintendent at Cummins and previously was Warden at Tucker Max, and she also has no authority to change a religious policy. (Doc. 41-3, p. 4; Doc. No. 45-9, p. 4) When she was at Tucker Max, the Deputy Warden (Ball) supervised the Chaplain, who was Bourgeois. (Doc. No. 41-3, p. 5) She does recall concerns about too few Muslim free world volunteers and welcomed the participation from the Madina Institute. (Doc. No. 45-9, p. 4) At Tucker, they experienced a general shortage of security staff which resulted in the cancellation of different religious events on five or six occasions. (Doc. No. 41-3, pp. 6, 8) In addition, while she was at Tucker she observed Jumu'ah and Ramadan three to four times and never observed conflict among the inmates or between the Muslims and NOI inmates. (Id., pp. 9, 11) She once was aware of a conflict involving an inmate prayer leader and brought in Chaplain Ameen to resolve the issue. (Id.) Culclager cannot change the headdress policy and a change would concern her because it would set some inmates apart from others and prompt other religions to wear their own headdress. (Doc. No. 45-9, p. 5) Although she is not aware of an incident where contraband was found in a religious headdress, a change in the policy would place a burden on security staff with

respect to shakedowns. (Id.)

g)      **Dexter Payne**

Payne became the Director of Institutions for the ADC in July 2019 (Doc. No. 41-1, p. 6) Prior to that he served as Deputy Director of Institutions, and he also previously served as Warden at Tucker and at Grimes. (Id.) He initially was employed as a security officer for the ADC from 1990-2007, and occasionally attended a Jumu'ah service. (Doc. No. 45-11, p. 12) The Chaplaincy Administrator deals mostly with religious policies and Payne is not involved in setting those policies. (Doc. No. 41-1, pp. 6-7) He is not aware of an incident where contraband was transferred into a facility by way of a Kufi, or of any other incident involving a Kufi. (Id., pp. 12-13) There is no security concern with use of a Kufi in an inmate's cell, or in the one-hour services where security is present. (Id., p. 13) However, use of a Kufi in other areas would increase the possibility of transporting/possessing contraband and would encourage other groups to want to wear a hat. (Id., pp. 13-15) Inmates are not allowed to wear any head covering in any common areas of the prison, with limited exceptions for a few inmates who receive medical accommodations to cover their heads. (Doc. No. 54-2, p. 2) Payne stated that the ADC has not received funding from the federal government since March 2016 or federal financial assistance from organizations that distribute federal prison funding. (Doc. No. 41-14)

h)      **Wendy Kelley**

Kelley is the Secretary of the Arkansas Department of Corrections (ADOC), since July 2019, and served previously as the Director of the Arkansas Department of Correction,

which is now known as the Arkansas Division of Correction (ADC). (Doc. No. 54-1, p. 1)
In FY 2019, the ADC sold two horses to the Department of Interior for $9,000. (Id., p. 2)
The ADC did not receive funds via the Arkansas Department of Finance and
Administration under the federal government's Residential Substance Abuse Treatment
(RSAT) for State Prisoner's Program, and no inmates received treatment or other direct or
indirect benefits from the federal RSAT funds. (Id.) The ADC also does not receive Pell
Grants or Second Chance Funds for use in prisons. (Id.)

### i)    Christopher Budnik

Budnik is the Warden of the Delta Regional Unit in Dermott, Arkansas. (Doc. No.
54-5) Plaintiff Martin has not been incarcerated at that Unit since 2012, and the Unit does
not allow Rastafarian inmates to wear Kufis at all times and in all locations of the Unit.
(Id., p. 2)

### D.    Other Exhibits

a)    Cummins Chapel Schedule of Religious Services/
Activities (9/8/16) (Doc. No. 45-3)

b)    Max Unit Chapel Activity Calendar, July 2019 (Doc. No. 45-4)

c)    EARU Chapel Calendar June 2018 (Doc. No. 45-5)

d)    Massachusetts Department of Correction Religious Services
Handbook (Doc. No. 45-31, pp. 5-8)

e)    ADOC Organizational Chart (Doc. No. 56-2, Ex. A)

f)    ADC divisions and departments (Id., Ex. B)

g)   Arkansas Community correction homepage (Id., Ex. C)

h)   Arkansas Correctional School homepage (Id., Ex. D)

i)   Arkansas Department of Education Grants FY 2017 (Id., Ex. E)

j)   Arkansas Democrat Gazette Article (Id., Ex. F)

k)   ADC Annual Report FY 2018 (Id., Ex. G)

l)   Georgia Department of Corrections Islamic Guidelines (Doc. No. 54-3, p. 1)

## IV.   Summary Judgment

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).   "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).   "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135.   Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a

28

genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

## A.    RLUIPA

### 1)    Application

Initially, the Court must determine if the RLUIPA applies to the ADC. According

to the Statute, 42 U.S.C.A. § 2000cc-1:

(a)    General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
      (1) is in furtherance of a compelling governmental interest; and
      (2) is the least restrictive means of furthering that compelling governmental interest.

(b)    Scope of application

This section applies in any case in which –
      (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or
      (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

Plaintiffs, and the United States, argue that the RLUIPA applies to the ADC because

it receives federal funding. Specifically, they point to the following:

-    The Corrections School System, a division of the Arkansas Department of Corrections (ADOC) (not to be confused with ADC), received federal funds in 2017. (Doc. No. 56-2, p. 17)

-    The State of Arkansas received federal Pell grants and Second Chance Funds for use in prisons and for rehabilitation purposes. (Id., pp. 99-107)

-    The ADOC Division of Community Correction received a grant of $999,817

from the Department of Justice (DOJ) Office of Justice Programs which continues through September 30, 2021, and also received a payment of $13,480 in 2019 from the DOJ Criminal Division's Money Laundering and Asset Recovery Section. (Doc. No. 64, p. 3, n. 3)

- The ADC received a $9,000 grant for patrol horses. (Doc. No. 56-2, pp. 176-79)

- The Arkansas Department of Finance and Administration (DFA) received grants under the federal government's Residential Substance Abuse Treatment (RSAT) for State Prisoner's Program in 2019. (Id., p. 171)

In response, Defendants argue that the ADC has not received federal funds since 2016, that the Corrections School System and the Division of Community Correction are not part of the ADC, and that those divisions are not charged with operating the prisons in Arkansas. Defendants also state that the $9,000 received for patrol horses was not a grant, but the result of a contract of sale to the Department of Interior in 2019. In addition, any Pell grants are received by individual inmates and are used for tuition/expenses associated with taking classes at schools not operated by the ADC.

Having reviewed the arguments and exhibits presented by all the parties, the Court finds this issue as clear as mud, for numerous reasons. First, much of the issue is based on the organizational structure of the ADC. Prior to July 1, 2019, the prisons in Arkansas were operated by the Department of Correction (no "s") (ADC). Ark. Code Ann. (ACA) § 12-27-103, effective April 7, 2015 to June 30, 2019. The agency did not include any divisions or subdivisions. Arkansas Department of Correction 2019-2020 Strategic Plan, at 11, available at https://adc.arkansas.gov/images/uploads/Arkansas_Strategic_Plan_2019-

2020_Director_Final.pdf. Plaintiffs filed this Complaint against Defendants (as employees of the ADC) on March 1, 2019. (Doc. No. 1) On July 1, 2019, the Transformation and Efficiencies Act of 2019 became effective and essentially reorganized 42 independently-operated state agencies into fifteen cabinet-level agencies. Ark. Acts No. 910 (2019). As a result, the Department of Correction**s** (ADOC) (emphasis added) was created as a cabinet-level agency to oversee the administrative functions of several divisions which were separate and distinct agencies prior to July 1, 2019. See ARK. CODE ANN. § 15-43-402. Those divisions include the Arkansas Sentencing Commission, the Corrections School System, The Department (now Division) of Community Correction, the Department (now Division) of Correction (ADC), and others. Id. While Plaintiffs provide proof that some of these divisions received federal funds, they have not provided clear proof that the ADC received federal funds at the time the Complaint was filed or after. For example, Plaintiffs provide no proof that the money appropriated to the Corrections School and the Department of Community Correction was used by the ADC for prison purposes. In addition, while the RSAT funds awarded to the Arkansas DFA were intended to assist "states and local governments to develop and implement substance abuse treatment programs in state and local correctional and detention facilities," Plaintiffs provide no proof that any of the funds were received and used by the ADC. (Doc. No. 56-2, pp. 181-182) Instead, Plaintiffs claim that since the ADC and the Division of Community Corrections are now both subdivisions of the ADOC (as of July 1, 2019), they constitute a "Department, agency, special purpose district, or other instrumentality of a State or of a local government," within the meaning

of the RLUIPA. 42 US.C.A. § 2000cc-5(6)

With respect to the horse issue, according to the Affidavit of ADOC Secretary Wendy Kelley and the accompanying invoice, the ADC did not receive a grant for horses, but sold two horses to the Department of Interior for $9,000. (Doc. No. 54-1) However, while Defendants claim this does not constitute funding, Plaintiffs argue that the RLUIPA speaks to "federal financial assistance" which includes acceptance of federal funds whether by grant or contract, citing numerous C.F.R. definitions of "federal funds." See also United States Dep't of Transp. v. Paralyzed Veterans, 477 U.S. 597, 607 n. 11 (1986).   With respect to the Pell grants and Second Chance Funds, the document submitted by Plaintiffs states such are awarded "to the colleges" (Shorter College in North Little Rock and Arkansas State University-Newport) to help fund the education of inmates at ADC facilities. (Doc. No. 56-2, pp. 99-107)

Initially, the Court notes that neither side argues the applicability of RLUIPA to the ADC by virtue of the effect on commerce. 42 U.S.C.A. §2000cc-1(b)(2). In addition, the United States admits that it found no reported cases under the RLUIPA which directly address the question of whether an **entire agency** must comply with RLUIPA when one subdivision receives federal financial assistance. (Doc. No. 64, p. 7, n. 8) The United States instead looks to how the statutory language incorporated in the RLUIPA was applied and interpreted in the context of civil rights laws which also are conditioned on the receipt of federal funds. For example, in Thomlison v. City of Omaha, the United States Court of Appeals for the Eighth Circuit held that the Rehabilitation Act applied to the Omaha Fire

Division, because it comprised part of the Public Safety Department which also included Police and Communications Divisions which received federal funds. 63 F.3d 786, 789 (1995). The court stated, "[b]ecause the definition of program or activity covers all the operations of a department, here the Public Safety Department, and part of the Department received federal assistance, the entire Department is subject to the Rehabilitation Act." Id.

While this issue does not constitute a dispute of fact so as to support a denial of both Summary Judgment Motions, it constitutes a dispute of interpretation which, as noted earlier, is far from clear. Therefore, the Court will refrain from deciding this issue, finding that it is not dispositive of the case, for reasons set forth in Section 3 below.

### 2) Capacity

Defendants Kelley, Reed, and Mayfield are sued in their official capacities only. (Doc. No. 1-2) Defendants Payne, Culclager, Bourgeois, and Babcock are sued in their official and individual capacities, and Defendants Burl, Earl, Bradshaw, and Straughn are sued in their individual capacities only. (Id.) Sovereign immunity deprives federal courts of jurisdiction over suits against Defendants in their official capacities, unless the state waives its immunity or Congress abrogates it pursuant to a valid exercise of Congressional power. Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54-55 (1996). The State of Arkansas and its agencies and officials have not consented to suit in federal court (Burk v. Beene, 948 F.2d 489, 493-94 (8th Cir. 1991)), and the RLUIPA did not abrogate the states' sovereign immunity. Sossoman v. Texas, 563 U.S. 277, 286-88 (2011). Therefore, the Plaintiffs can only recover injunctive relief from those Defendants sued in their official

capacities for a violation of the RLUIPA. And the RLUIPA does not permit actions against government employees in their individual capacities. See Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012).

### 3)    The RLUIPA Standard

Initially, Plaintiffs bear the burden of proving that their requests are based on sincerely held religious beliefs, which in this case are that they worship with other like-minded Muslims and may wear their Kufi caps at all times. Holt v. Hobbs, 574 U.S. 352, 360-1 (2015). In addition, they also must prove that Defendants and the policies at issue substantially burden their religious exercises. Id. at 361. Religious exercise is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." RLUIPA, 42 U.S.C. § 2000cc-5(7)(A). Once these hurdles are met, the burden shifts to the Defendants to show that the policies are in furtherance of a compelling governmental interest and are the least restrictive means of furthering that interest. Holt, 574 U.S. at 863.

In determining whether Plaintiffs' beliefs are sincerely-held, courts look to "whether the line drawn by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs reflects an honest conviction." Fox v. Washington, 949 F.3d 270, 277 (6th Cir. 2020) (other citations omitted). However, once Plaintiffs allege a violation of their sincerely held religious beliefs, "'it is not for us to say that the line he drew was an unreasonable one.'" Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 725 (2014) (quoting Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 715

(1981)). The policies at issue will constitute a substantial burden if Plaintiffs show that they "'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'" Murphy v. Missouri Dep't. of Corrections, 372 F.3d 979, 988 (8th Cir. 2004) (quoting Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997) (other citations omitted)).

### a)    Jumu'ah Prayer

Defendants do not appear to question the sincerity of the Plaintiffs' beliefs in this case. All three Plaintiffs testified/declared that they are of the Muslim faith, that they are obligated to attend a congregational prayer in the early afternoon hours every Friday (Jumu'ah), and that the prayer must be led by a Muslim and include a qutba/Khutbah (sermon). (Doc. Nos. 45-10, 45-12, 45-14) Plaintiffs further stated that their prayer is invalidated if they participate in services which are led by a follower of NOI or NGE, and they denied that those followers are true Muslims. (Id.) Therefore, the Court finds Plaintiffs established a sincerely-held religious belief.

The next question is whether the **policies** impose a substantial burden on the Plaintiffs' religious beliefs/practices. In rendering that determination, a substantial burden may exist "when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 988 (8th Cir. 2004) (other citations omitted).   All

three of the Plaintiffs testified about occasional deviations from the policy by prayer leaders who espouse different philosophical/political beliefs. Testimony and evidence by both parties show that the ADC developed the Jumu'ah prayer policy and other religious policies in accordance with the <u>Blue</u> litigation and other lawsuits, and that the Jumu'ah prayer service was designed to meet the needs of all Muslim inmates. Chaplain Ameen declared that while there are various Islamic sects or "schools of thought," each hold the Qur'an as the principal religious text, study and adhere to the words and actions of the Prophet Muhammad, and each participate in the Friday Jumu'ah Prayer. (Doc. No. 41-10, p. 2) He considers NOI adherents, Sunni Muslims and Shi'a Muslims as different "schools of thought" which study and adhere to the words and actions of the Prophet Muhammad. (<u>Id</u>.) While he acknowledged interpretive differences and disagreements on social or political issues between the different schools of thought, he stated their Jumu'ah Prayer and Taleem classes are similar because they are based on the word of God in the Qur'an. (<u>Id</u>., p 3) Ameen also acknowledged that on a few occasions he became aware that the inmate prayer leader deviated from policy and made inappropriate comments for non-denominational Jumu'ah prayer services. (<u>Id</u>., p. 8) In those instances, he removed the inmate and selected another inmate for the role, always relying on inmates to inform him of those problems. (<u>Id</u>.) Chaplain Mayfield stated that the ADC considers NOI and NGE adherents as denominations of Islam, and stressed that Friday prayer services, Taleem, Ramadan, and the Eid feasts are all nondenominational. (Doc No. 45-1, pp. 14, 15) The Jumu'ah prayer policy, 545, was written to comply with a court order and nothing in the policy prohibits

the ADC from providing a denominational Islamic service as long as at least three inmates request it and they have a free-world sponsor. (Id., p. 24.)

Despite the Plaintiffs' concerns about occasional deviations, the Court finds as a matter of law that the ADC Jumu'ah prayer policy itself does not significantly inhibit or constrain their conduct or expression which manifests a central tenet of their individual beliefs, or curtail their ability to express their adherence to their faith, or deny them reasonable opportunities to engage in those activities that are fundamental to their religion. In his deposition, Plaintiff Holt acknowledged that a NOI prayer leader leads prayer properly if he leads in accordance with Islam and sticks to the Qur'an. (Doc. No. 45-15, p. 18) Although he also stated he would not pray behind a Shia or Sunni inmate, and stopped attending Jumu'ah in 2016 when a prayer leader became political in his statements, in a second Declaration he stated that one of his goals in this lawsuit "is to have an Islamic *jumu'ah* service attended and led by Muslims, be they Sufi, Salafi, Shia, or Sunni." (Id., p. 23; Doc. No. 41-9, p. 15; Doc. No. 57-2, p. 2) Plaintiff Martin testified that if an inmate prayer leader conducts prayer correctly, it falls in line with his beliefs, and if he was not incarcerated, he would attend a Mosque with Sunni Muslims. (Doc. No. 45-19, pp. 4, 13.) In his second Declaration he added that he would happily pray with Muslims of all denominations at Jumu'ah services led by Muslims. (Doc. No. 57, p. 3) And Plaintiff Stewart stated that the way the ADC policy is now, it satisfies his ability to practice the religion of his choice, but that the problem is with some inmates who do not follow the policy. (Doc. No. 45-24, p. 15) All three insist that NOI and NGE adherents are not

Muslims, but different religions. (Doc. Nos. 57, 57-1, 57-2) Yet, the ADC religious services policies provide for non-sectarian weekly and special services, the ability to practice and participate in Ramadan, possession of the Qur'an and prayer beads and prayer rugs, and the option to request a sectarian service if a free world volunteer is present. (See Doc. No. 45, pp. 9, 13-15, 18-19) According to the Jumu'ah prayer service policy, it is the only religious service where a free-world volunteer is not required. (Doc. No. 45, pp. 9-10) Therefore, it appears that Plaintiffs' complaint is centered more on **how** the policy occasionally is carried out, rather than the substantive policy itself. A government regulation is not a substantial burden "if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed." Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004). Plaintiffs presented little evidence that Defendants and the ADC policies imposed a substantial burden on the exercise of their religious beliefs. And, both Holt and Martin testified that they do not attend the services; therefore, they do not have first-hand knowledge of how those services are conducted on a regular basis.[2]

Plaintiffs also presented no evidence that Defendants and/or the religious policies prohibit them from praying or practicing their beliefs in their cells or from participating in Ramadan and other festivals. In addition, they present no evidence that the religious

---

[2] Holt testified that he stopped attending Jumu'ah prayer while at Cummins, and has not attended a Jumu'ah service at Tucker, and gets his information "second handed." Doc. No. 41-9, p. 15; No. 45-15, p. 25) Martin testified that he has not attended a service at EARU. (Doc. No. 45-19, p. 19).

policies pressured them to substantially modify their behavior or violate their beliefs. In Marshall v. Pennsylvania Dep't of Corr., the court listed several other jurisdictions which similarly found that separate Jumu'ah services for different Muslim sects are not required by the RLUIPA. No. CIV.A. 3:12-0351, 2015 WL 1224708, at *11 (M.D. Pa. Mar. 17, 2015), aff'd, 690 F. App'x 91 (3d Cir. 2017)

However, even if the Court considers the policy, as carried out, to be a substantial burden on Plaintiffs' religious exercise, the Court finds that it is the least restrictive means of achieving a compelling government interest. Testimony and evidence establish the development of the religious and Jumu'ah service policies as guided by the Blue and Shabazz litigations, and that the policies provide for non-denominational services to meet the needs of several Islamic schools of thought. In addition, once deviations from the non-sectarian purposes of the policies are reported to the Chaplains, they are addressed and resolved. There is no dispute that Jumu'ah prayer must be conducted during a limited time period on Fridays, and that security concerns and space and time constraints weigh heavily in favor of a single nondenominational service to meet the needs of all Muslims. While Plaintiffs argue that the least restrictive means would be a sectarian service in accordance with their Muslim practices and beliefs, Plaintiffs do not allege that they requested, and were denied, such a service. Plaintiffs also do not dispute that ADC policies permit sectarian services if a free world volunteer is available. In fact, it could also be argued that the Jumu'ah policy is more flexible with Defendants and their belief systems than others, as the Jumu'ah prayer service is the only service which can occur without the presence of

a free-world volunteer or chaplain.

### b) Kufi

There is no dispute that the ADC prohibits the wearing of Kufi hats in all areas except the worship services and the inmates' housing areas. Plaintiffs argue that the policy burdens their ability to worship by preventing them from wearing them all the time. Martin stated that wearing a Kufi gives him a certain strength and reminds him at all times that he is in service to Allah. (Doc. No. 45-19, p. 18) He also argued that medical personnel can give inmates permission to wear a hat at all times and in all places and that he has seen inmates wearing headgear at all times and in all places. (Doc. No. 45-14, p. 4) Stewart testified that he should be able to wear a prayer cap at all times because he is in prayer at all times. (Doc. No. 45-24, p. 10) The Court finds this constitutes a substantial burden, to the extent that this inhibits or constrains their conduct or expression (wearing a hat) which manifests a central tenet of their individual beliefs, or curtails their ability to express their adherence to their faith.

As noted earlier, once a substantial burden is established, the burden shifts to the Defendants to show that the ADC policy furthers a compelling governmental interest and is the least restrictive means of doing so. According to the testimony of Defendants, the main concern with allowing head coverings in the common areas is security. The general consensus was that other non-Muslim inmates might disrespect the Muslim inmates by trying to wear their own version or by stealing or damaging an inmate's Kufi, or that they would be used by gang members to identify themselves through certain colors, designs or

signs, or that they would be used to hide contraband. (See depositions of Mayfield, 45-1, pp. 37-38; Babcock, 45-6, p. 37; Bourgeois, 45-7, p. 18; Burl, 45-8, p. 5; Culclager, 45-9, p. 5) While Payne, Culclager and Babcock all stated they were unaware of a situation where a Kufi was used to hide contraband, Mayfield stated he was aware of two to five instances in the past ten years. (Doc. No. 41-2, p. 54) He stated that he could not recall specific details, other than one time a SIM card was found under an inmate's Kufi. (Id.)

A policy which prohibited inmates from wearing a Kufi outside of their cell was held not to substantially burden the inmates' religious exercise and narrowly-tailored to meet the compelling interest of prison safety and security, in Jihad v. Fabian, 680 F.Supp.2d 1021, 1027-8 (D.Minn. 2010). Similarly, this Court finds that Defendants' policy which prevents all head coverings in common areas, with the limited medical exceptions, is narrowly tailored to meet a compelling interest in security.

### B.    Free Exercise

#### 1)    Capacity

Sovereign immunity deprives federal courts of jurisdiction over § 1983 suits for money damages against Defendants in their official capacities, as state employees who act in their official capacities are not considered "persons" within the meaning of the statute. Will v. Mich. Dep't of State Police, 491 U.S. 58, 65-66 (1989). Defendants also ask the Court to dismiss Plaintiffs' § 1983 monetary claims against them in their individual capacities, based on qualified immunity, which protects officials who act in an objectively reasonable manner.   It may shield a government official from liability when his or her

conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact.   <u>McClendon v. Story County Sheriff's Office</u>, 403 F.3d 510, 515 (8th Cir. 2005).   Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. <u>See</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful.   <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).[3]   Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. <u>Nelson v. Correctional Medical Services</u>, 583 F.3d 522, 528 (8th Cir. 2009).

### 2)    Standard of Review

---

[3]Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Nelson</u>, 583 F.3d at 528 (quoting <u>Pearson v. Callahan</u>, 555 U.S. at 236).

Prisoners retain First Amendment freedoms which are not inconsistent with their status or with legitimate penological objectives of the corrections system. Pell v. Procunier, 417 U.S. 817, 822 (1974). When analyzing a First Amendment challenge, courts are more deferential to prison officials than when analyzing a claim filed pursuant to the RLUIPA. See Gladson v. Iowa Dep't of Corr., 551 F.3d 825, 832-33 (8th Cir. 2009). "'A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" Murphy, 372 F.3d at 982 (quoting Turner v. Safley, 482 US. 78, 89 (1987)). The first step in determining whether a prison rule or policy violates the First Amendment is to determine "whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the Turner factors to determine if the regulation restricting the religious practice is reasonably related to legitimate penological objectives." Gladson, 551 F.3d at 831 (other citations omitted). Those factors include whether there is a valid rational connection between the regulation and the governmental interest, whether an alternative means is available to the prison inmates to exercise their right, whether an accommodation would have a significant effect on guards, inmates and prison resources, and whether there is an available alternative which accommodates the prisoner at a de minimis cost. Turner, 482 U.S. at 89-90.

### a) Jumu'ah Prayer

While the parties dispute whether the religious policies infringe on the Plaintiffs' sincerely held religious beliefs, the Court finds as a matter of law that there is a valid

rational connection between the policies and governmental interests in security concerns, volunteer availability, Plaintiffs' religious liberties, and space and time constraints. Jumu'ah prayer takes place every Friday at the time specified by Plaintiffs' beliefs, regardless of the presence of a free world volunteer. And because all Muslims meet at the same time, security, staffing and administrative concerns are reduced. In Janali, supra, the court found that unified Jumu'ah prayer services were rationally related to legitimate penological interests related to security concerns. 2013 WL 6536373 at *6. And as noted by the court in Murphy when analyzing a First Amendment free exercise claim, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." 372 F.3d at 983. The ADC prayer policy is nondenominational/nonsectarian, and the religion policies also permit Plaintiffs to request a separate sectarian service if they can find a free world volunteer to be present. Plaintiffs are allowed to pray in their cells, participate in special religious observances, use prayer rugs, beads, and study the Qur'an. When a prayer leader deviates from the policy and a Chaplain or other supervisor is notified, corrective action takes place. Plaintiffs also do not dispute that they have alternative means of exercising their religious beliefs, through individual prayer, reading the Qur'an, attending Taleem classes, and participating in special religious observances. See O'Lone v. Shabazz, 482 U.S. 342, 351 (1987). And for reasons set forth by Defendants in their deposition testimonies, separate sectarian services would have a substantial impact on prison personnel and resources, such as security needs, volunteer availability, space and time availability, personnel and staffing and

scheduling issues. Finally, Plaintiffs offer no reasonable alternatives that would fully accommodate their asserted rights, because they seek to dictate who attends "their" services. Plaintiffs do not appear to challenge the ADC Jumu'ah Prayer policy itself, but rather, how it has been implemented and supervised. Their wishes to attend with fellow believers are not foreclosed by the policies; rather, they must meet the policy requirements for worshipping in a sectarian service. Finally, the Court finds no evidence to support Plaintiffs' claim that the above justifications for a nonsectarian service are merely pretexts to an agenda to somehow control the teachings of the more radical Muslim groups.

While Plaintiffs cite to some non-Eighth Circuit case law which found a substantial burden placed on inmates who could not worship solely with others with similar beliefs, the case law is insufficient to constitute well-established law requiring multiple sectarian Muslim services, as opposed to a single nonsectarian service. See Fox v. Washington, 949 F.3d 270, 280 (6th Cir. 2020); therefore, the Court finds that Defendants are entitled to qualified immunity on this issue, as a matter of law.

### b) Kufi

Similarly, Plaintiffs establish a sincerely held religious belief in wearing their Kufi caps. However, they submit no clearly established law which supports their claim that Defendants' restrictions on the wearing of those caps are not reasonably related to legitimate penological interests. As noted above in the RLUIPA analysis, the no headdress policy in common indoor prison areas applies across the board to all coverings,

with the limited medical exception cases. Defendants presented valid security concerns for restricting the head coverings, such as a fear of misuse/disrespect by non-Muslims, and use of caps to hide contraband or promote gang membership. Plaintiffs presented no evidence to show that an alternative exists which fully accommodates them at de minimis cost to Defendants' valid penological interests. In addition, in determining an alternative means available to Plaintiffs, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." Murphy, 372 F.3d at 983. Again, Plaintiffs do not present well-established law which indicates that Defendants' restrictions on their head coverings violate their First Amendment rights.

## IV. Conclusion

IT IS, THEREFORE, RECOMMENDED that:

1.      Defendants' Motion for Summary Judgment (Doc. No. 41) be GRANTED.

2.      Plaintiffs' Motion for Summary Judgment (Doc. No. 44) be DENIED.

3.      Plaintiffs' Complaint be DISMISSED with prejudice.

IT IS SO RECOMMENDED this 17th day of August, 2020.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE