IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**GREGORY HOUSTON HOLT,** *et al.*                                    **PLAINTIFFS**
**ADC #129616**

**v.**                              **CASE NO. 5:19-CV-00081-BSM**

**DEXTER PAYNE,** *et al.*                                              **DEFENDANTS**

<u>**ORDER**</u>

After a three-day bench trial, judgment was entered for defendants and against plaintiffs on all claims. Plaintiffs appealed and the Eighth Circuit Court of Appeals reversed. Having reviewed the entire record again and applied the standard provided by the Eighth Circuit, judgment is entered for defendants on the claims challenging the Arkansas Division of Correction's ("ADC") religious headdress policy. With respect to plaintiffs' claims challenging the ADC's Jumu'ah service policy, no ruling is made at this time. Instead, discovery is reopened for six months to permit the parties to obtain evidence regarding this issue. One month after the close of discovery, the parties will have an opportunity to brief the issue described herein. Mediation is encouraged if the parties believe there is room to reach a mutually acceptable compromise on this issue.

I. BACKGROUND

Plaintiffs Gregory Holt, Wade Stewart, and Rodney Martin are Muslim inmates who sued the ADC and its officers alleging that the ADC's Jumu'ah prayer and religious headdress policies violate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.§ 2000cc, *et seq.* At trial, plaintiffs argued that ADC policies

violated RLUIPA in two ways: first, by requiring them to pray alongside members of the Nation of Islam ("NOI") and the Nation of Gods and Earths ("NGE") (groups they view as non-Muslims) during Jumu'ah prayer, a Friday midday congregational service required by their religion; and second, by prohibiting them from wearing kufis—a brimless, short, and rounded religious head covering some Muslims wear regularly—except during religious services.  After the trial and post-trial briefing, a ruling was entered in favor of defendants. The Eighth Circuit reversed and remanded with instructions to apply the standard as set forth in its opinion.

## II.  DISCUSSION

Courts considering a RLUIPA claim use a two-step framework: (1) whether plaintiffs proved they had a sincerely held religious belief that was substantially burdened by the policies at issue; and (2) if so, whether defendants proved those policies were the least restrictive means of furthering a compelling government interest.  *See Holt v. Hobbs*, 574 U.S. 352, 360–62 (2015) ("*Holt I*").  "When other prisons offer a particular accommodation, a prison must, at least, 'offer persuasive reasons why it believes that it must take a different course.'"  *Holt v. Payne*, 85 F.4th 873, 879 (8th Cir. 2023) ("*Holt II*") (quoting *Holt I,* 574 U.S. at 369).

A.    Jumu'ah Service Policy

At this stage, additional discovery and briefing is appropriate because the circumstances upon which I relied in upholding the ADC's Jumu'ah service policy may no longer exist.

The Eighth Circuit's opinion compels the finding that plaintiffs met their burden under RLUIPA with respect to the Jumu'ah service policy, although it appears to discount conflicting evidence regarding each of the plaintiffs' beliefs on separate Jumu'ah services. *See* Trial Tr. Vol. 2 at 317:15–318:3 (Stewart testified that the ADC's policy satisfies his ability to practice his religion); *id.* at 369:21–370:11 (Martin testified that he did not have a problem with NOI adherents attending Jumu'ah services if ADC policies were followed); *id.* at 435:15–24 (Holt testified that a joint service was appropriate and in accordance with Islamic law even when an NOI adherent was leading the prayer).  My prior holding that the ADC has a compelling interest in prison security served by its Jumu'ah service policy was not disturbed on appeal and remains valid.  That leaves only the question of whether that policy is the least restrictive means to address the ADC's compelling security interests, considering plaintiffs' proposed alternatives.

The ADC maintained at trial that it could only provide a single joint Jumu'ah service for Muslims and NOI and NGE adherents due to space limitations and a shortage of guards and chaplains. Trial Tr. Vol. 1 at 92:3–14, 118:13–16, 129:11–14, Doc. No. 160;  Trial Tr. Vol. 3 at 570:23–572:5, Doc. No. 162.  The ADC showed that at the time of trial, it was severely understaffed and having difficulties recruiting and retaining guards.  Trial Tr. Vol. 1 at 158:17–159:13; 173:18–175:7, 236:6–21; Trial Tr. Vol. 2 at 274:6–24, 276:24–278:12; 489:5–14.

On the other hand, plaintiffs proposed a number of alternatives to the current policy that would allow them to worship separately from NOI and NGE adherents: (1) holding

consecutive (but shorter) Jumu'ah services in the same room with normal group transition, Trial Tr. Vol. 3 at 563:6–16; Trial Tr. Vol. 2 at 393:14–17; (2) holding consecutive (but shorter) services in the same room with NOI/NGE adherents and traditional Muslims moved in and out as one group with one part worshiping while the other sat to the side and then vice versa, Trial Tr. Vol. 3 at 563:9–16; Trial Tr. Vol. 2 at 393:14–17; (3) holding simultaneous services with a curtain or temporary wall between the two groups, Trial Tr. Vol. 2 at 320:9–16, 328:1–23; Trial Tr. Vol. 3 at 563:6–16; and (4) holding simultaneous services with the groups in different rooms.  Trial Tr. Vol. 1 at 94:1–96:17.  Plaintiffs showed that some ADC facilities had the space for simultaneous Jumu'ah services, Trial Tr. Vol. 1 at 155:11–16, and that some ADC facilities were able to accommodate multiple religious groups meeting at a time before the COVID-19 pandemic.  Trial Tr. Vol. 1 at 82:15–86:24, 131:3–12, 158:3–10.  The ADC presented testimony, however, that these options were not feasible because of its staffing shortage. Trial Tr. Vol. 1 at  92:3–14, 96:12–17, 129:11–14.

This case was tried in 2021 in the midst of significant labor market disruptions from the COVID-19 pandemic.  *See generally* Trial Tr. Vol. 1 at 130:22–131:2.  Because it is unclear to what extent the ADC's staffing conditions and space restrictions continue to impair its ability to offer multiple Jumu'ah services each Friday in at least some of its facilities, the parties are directed to engage in discovery and file briefs on this topic after the close of discovery.

B.    <u>Religious Headdress Policy</u>

Although on remand, I assume plaintiffs have satisfied their burden of the RLUIPA

4

framework, judgment is entered for defendants on plaintiffs' challenge to the ADC's religious headdress policy because defendants have shown that it is the least restrictive means of achieving the ADC's compelling interest in security.

The Eighth Circuit's opinion compels the finding that plaintiffs met their burden under RLUIPA. First, the Eighth Circuit held that it was impermissible to find that plaintiffs' belief was not a sincerely held religious belief based on their inconsistencies in practicing it and admissions that their religious text did not require it. I note that my previous findings were based on a reasoned assessment that plaintiffs' claimed beliefs regarding kufi use were not credible after witnessing their testimony firsthand over multiple days of trial. Their inconsistencies and admissions formed only part of this holistic impression. *See* 8th Cir. Civil Jury Instr. 3.03. Nonetheless, the Eighth Circuit's opinion appears to override what I witnessed in the courtroom and forecloses a finding that plaintiffs do not have a sincerely held religious belief that they must always wear a kufi. The ADC's policy forbidding plaintiffs from wearing kufis except during religious services is therefore found to substantially burden plaintiffs' belief that they must wear kufis because it places them at risk of disciplinary action for doing so even if is not consistently enforced. *See Holt I*, 574 U.S. at 361 (choice between violating religious beliefs and risking disciplinary action was substantial burden); Trial Tr. Vol. 2 at 256:11–257:4.

On remand, I hold that defendants have met their burden to rebut plaintiffs' RLUIPA claim. As an initial matter, my prior holding that the ADC has a compelling interest in prison security served by the religious headdress policy was not disturbed on appeal and remains

valid.  Next, the Eighth Circuit questioned my holding that the ADC's religious headdress policy was the least restrictive means of furthering its compelling security interest, stating that I failed to address plaintiffs' proposed alternatives to banning kufi use altogether and implying that the ADC failed to assert persuasive reasons why it must ban kufi use when other prisons do not.  The prior order was not detailed enough to adequately convey to the Eighth Circuit that I considered plaintiffs' proposed alternatives and the ADC's reasons for its religious headdress policy in determining that the current policy was the least restrictive means of furthering its interest.  For this reason, I will more extensively explain my reasoning now.

### 1.  Findings of Fact

1.      The ADC's current policy allows inmates to wear religious headdress, including kufis, only during religious services or in individual cells.  Trial Tr. Vol. 2 at 256:11–257:4, Doc. No. 161.

2.      Its policy is not specific to kufis but applies to all religious headdress.  Trial Tr. Vol. 1 at 72:12–14, Doc. No. 160; Trial Tr. Vol. 3 at 533:15–19, Doc. No. 162.

3.      At present, only two kinds of headgear are approved for use in ADC facilities outside of religious services and individual cells: (1) work hats; and (2) medical caps.  Trial Tr. Vol. 2 at 257:5–9, 262:15–17.

4.      Work headgear may only be worn in outside areas.  *Id.* at 258:12–17.

5.      Medical caps may only be worn by inmates who receive a prescription to wear one for medical reasons, such as burns.  *Id.* at 262:15–263:15.

6.      Contraband such as cell phones, SIM cards, drugs, and weapons is frequently found in ADC facilities.  *Id.* at 461:10–15.

7.      The ADC has a compelling security interest in preventing inmates from possessing contraband items.

8.      Kufis and other headgear can be used by inmates to hide and transport contraband items.  Trial Tr. Vol. 1 at 73:9–13, 110:11–111:5; Trial Tr. Vol. 2 at 250:10–16; 267:8–17; 460:2–461:9; Trial Tr. Vol. 3 at 499:9–19.

9.      The ADC has a compelling security interest in restricting behaviors and activities that lead to conflict and violence among inmates.

10.     Religious headgear can easily be stolen, knocked off, or otherwise treated disrespectfully, creating a source of conflict.  Trial Tr. Vol. 1 at 74:25–75:5; Trial Tr. Vol. 2 at 270:7–11.

11.     Furthermore, the mere fact of some inmates being allowed perceived privileges that others are denied, such as readily visible religious accessories, can be a source of conflict.  Trial Tr. Vol. 2 at 267:3–24.

12.     When an ADC policy is questioned by staff or the inmate population, the ADC sometimes considers what approaches its counterparts in other states and the federal government are taking in the area subject to the policy. Trial Tr. Vol. 1 at 45:21–46:8.

13.     In considering the feasibility of changing the ADC's religious headdress policy, an ADC official researched how other states had handled kufi use in prison and learned that kufis had caused security problems in other states.  *Id.* at 111:2–5.

14.     As alternatives to the current policy, plaintiffs proposed to allow inmates to wear kufis that are: (1) approved and sold by the commissary, Trial Tr. Vol. 3 at 507:16–508:3; (2) colored beige or white to prevent use for gang affiliation, *id.* at 511:15–21; or (3) made of a see-through mesh or knitted material to facilitate searches, *id.* at 306:25–307:9.

15.     The ADC could also only allow kufis that have all the above security risk-reducing attributes.

16.     Even if plaintiffs were only allowed to have kufis with the specific characteristics they propose, it would still create certain security risks.

17.     If the ADC permits Muslim inmates to wear kufis at all times, it will have to consider requests by other inmates who claim to believe their religion requires them to wear headgear too.  Trial Tr. Vol. 2 at 267:20–22; Trial Tr. Vol. 3 at 517:7–518:11, 530:20–531:6, 532:24–534:3.

18.     These requests will have to be evaluated by ADC chaplains.  Trial Tr. Vol. 2 at 475:14–476:13; Trial Tr. Vol. 3 at 531:2–6.

19.     If compelled to allow plaintiffs to wear kufis at all times, the ADC could do one of two things with respect to requests to wear religious headdress other than kufis: (1) review them on an individual basis and deny requests deemed to present too great a security risk; or (2) grant all such requests.

20.     As to the first option, in the aftermath of the *Holt I* decision requiring the ADC to let the plaintiff wear a one-quarter inch beard, thousands of inmates made requests to wear

8

a beard for religious reasons.  Trial Tr. Vol. 3 at 531:7–532:9, 541:2–20.

21.     This was "extremely burdensome" to the ADC, whose chaplains were overwhelmed for months trying to process requests.  *Id.* at 531:7–22, 541:2–20.

22.     As a result, the ADC eventually allowed any inmate who wanted a beard to grow one.  *Id.* at 531:7–22.

23.     If the court required the ADC to let plaintiffs wear kufis and its chaplains tried to process requests on an individual basis, the ADC would likely be overwhelmed in a similar manner.  *Id.* at 532:6–9.

24.     Even if the first option were logistically practicable, allowing some inmates to wear religious headdress but not others would breed conflict and dissension.  Trial Tr. Vol. 2 at 266:3–267:8, 269:24–270:6.

25.     As to the second option, if all requests for religious headdress were approved, then any inmate who wanted to could wear religious headgear at all times.

26.     Inmates would be able to wear types of headgear that may present even greater security concerns than kufis.  Trial Tr. Vol. 3 at 517:7–518:23.

27.     In either case, many additional inmates would end up wearing headgear at all times.

28.     Inmates are moved from one area of the facility in which they are being held to another numerous times each day.  *Id.* at 526:5–15.

29.     ADC personnel must search inmates' headgear when they move between areas within prison facilities to achieve the compelling security interest of preventing inmates from

9

carrying contraband.  *Id.* at 498:10–499:22; Trial Tr. Vol. 2 at 460:2–461:9.

30.    To search a kufi, it is necessary to turn it inside out and feel the seams to ensure that nothing has been concealed in it.  Trial Tr. Vol. 3 at 499:12–19.

31.    It takes about twenty seconds to thoroughly search the headgear of a cooperative inmate.  Trial Tr. Vol. 2 at 259:4–21.

32.    While conducting a headgear search, a guard is focused on the search and not able to fully attend to what the inmate in front of him and other inmates are doing.  Trial Tr. Vol. 3 at 499:1–22.

33.    Under the current policy, the ADC only needs to conduct headgear searches in two instances: (1) when inmates with work headgear come in from working outside; and (2) any time inmates allowed to wear a hat for medical reasons are moved within a facility. Trial Tr. Vol. 2 at 258:20–259:3; Trial Tr. Vol. 3 at 526:5–21.

34.    If the ADC lets inmates wear religious headgear at all times, that would require searches of many additional inmates' headgear every time they are moved inside ADC facilities.  Trial Tr. Vol. 3 at 505:3–506:17, 526:5–15.

35.    These additional searches would substantially complicate daily movement logistics even if they took the same amount of time as searches of nonreligious headgear.

36.    Additionally, although plaintiffs stated that they would consent to searches of their kufis, some inmates have objected to searches of other religious items.  Trial Tr. Vol. 2 at 310:18–22; Trial Tr. Vol. 3 at 527:11–21.

37.    This gives reason to believe that some inmates would object to searches of their

10

religious headgear, causing these searches to take longer on average than searches of nonreligious headgear.

38.     If many inmates were permitted to wear religious headdress at all times, the ADC's ability to safely move groups of inmates within its facilities would be jeopardized.

*2. Conclusions of Law*

1.     After reassessing the record in light of the Eighth Circuit's instructions, I again reach the conclusion that the ADC's current religious headdress policy is the least restrictive means of furthering its compelling interest in maintaining security in its facilities.

2.     The ADC has considered the policies and outcomes of prisons that allow religious headdress and offered persuasive reasons rooted in its own experience why it must take a different course.

3.     Any policy other than the current one would have negative repercussions for prison security: creating conflict among religious groups in the inmate population; preventing the ADC from moving inmates safely to mealtimes, work shifts, recreation time, religious services and other necessary activities; or allowing greater opportunities for inmates to smuggle contraband.

4.     I reach this conclusion after carefully considering plaintiffs' proposed alternatives and determining that they do not adequately address these security problems.

5.     First, even assuming that kufis with the risk-reducing characteristics plaintiffs proposed were the only religious headdress allowed and that this created no issues with other inmates, many additional searches each taking at least twenty seconds of the searching

guard's time and attention would still be required, causing disruptions to secure inmate movement within ADC facilities commensurate with the number of inmates allowed to wear kufis.  *See Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008) (acknowledging that prisons have "limited resources" and may restrict practices because they cause a "drain on prison security's manpower").

6.    But permitting kufi use would not occur in a vacuum—other inmates would seek approval to wear their own religious headdress.

7.    The ADC does not have the capacity to provide individual review of the flood of requests expected to ensue.

8.    Requests to wear beards following the *Holt I* decision so exceeded the ADC's capacity to evaluate them that it was forced to allow any inmate who wanted to wear a beard to do so.

9.    But evaluation of requests to wear beards was a simple inquiry of whether the inmate had a sincerely held religious belief entitling him to the one-size-fits-all relief of having a short beard.

10.   Evaluating requests for religious headdress would be much more complicated because ADC staff would have to determine not only whether the inmate had a sincerely held religious belief but what kind of religious headdress was being requested and whether it was compatible with prison security.

11.   Faced with the expected flood of religious headdress requests, the ADC could realistically do only one of two things: (1) approve only requests to wear approved kufis (at

least until the next lawsuit by inmates seeking approval of their desired religious headdress); or (2) approve all religious headdress requests.

12.    The first option would threaten security in ADC facilities by (1) causing conflict between inmates permitted to wear kufis and those prohibited from wearing their own religious headdress and (2) disrupting secure inmate movement within ADC facilities. *See Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005) (stating that prisons may decline "requests for religious accommodations" that "jeopardize the effective functioning of an institution").

13.    The second option would threaten security in ADC facilities by (1) giving inmates access to religious headdress in which they could more effectively hide contraband than approved kufis and (2) causing even greater disruptions to secure inmate movement within ADC facilities as numerous types of religious headdress had to be searched.  *See id.* at 722 (holding that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" and must be applied "with particular sensitivity to security concerns").

14.    I therefore hold that the ADC's current religious headdress policy is the least restrictive means to achieve its compelling interest in prison security and that the ADC provided persuasive reasons why it could not offer the accommodations plaintiffs request. *See Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1027 (D. Minn. 2010) (holding that regulations prohibiting inmates from wearing kufis outside their cells were "narrowly-tailored" and justified by "the compelling interest of prison safety and security").

13

IV.  CONCLUSION

For these reasons, judgment is entered for defendants on the claims challenging the ADC's religious headdress policy and discovery is reopened with respect to plaintiffs' claims challenging the ADC's Jumu'ah service policy as set forth above.

IT IS SO ORDERED this 16th day of April, 2024.

UNITED STATES DISTRICT JUDGE